UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

STEVEN CHASE,  CIVIL NO. 04-1500 (RHK/JSM)

    Plaintiff,

v.  REPORT AND RECOMMENDATION

JIM FLINN, et al.,

    Defendants.

The above matter came on before the undersigned upon defendants' Motion for Summary Judgment [Docket No. 20]. Defendant's motion was decided on the papers.[1] This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

For the reasons discussed below, IT IS RECOMMENDED THAT:

    1.    Defendants' Motion for Summary Judgment [Docket No. 20] be **GRANTED**; and

    2.    Plaintiff's Complaint be **DISMISSED WITH PREJUDICE**.

**I.    FACTUAL BACKGROUND**

This matter arises out of plaintiff Steven Chase's ("Chase") claims under the Family Medical Leave Act of 1993 ('FMLA"), 29 U.S.C. § 2601, et seq., that defendants interfered with his rights under the FMLA and that he was subjected to retaliation as a result of his absences protected by the FMLA. See First Amended Complaint. In particular, Chase asserted that defendants' failure to pay him his full salary from January 12, 2004, through March 5, 2004, interfered with his FMLA rights. Id., ¶ 29. Chase also claimed that

---

[1] See August 1, 2005 Order [Docket No. 33].

defendants' notice to him that his absences were counted as Absent Without Leave ("AWOL") and the requirement that he repay $709.42 for benefits received by him while on leave was an act of retaliation in violation of his FMLA rights under 29 U.S.C. § 2601. Id., ¶ 31.

The undisputed facts are these. Chase was hired by defendant the United States Postal Service ("Postal Service") in 1986. See Defendant's Exhibit List ("Defs.' Ex."), Ex. 1 at p. 7 (Chase Dep.). In 1994, Chase was promoted to his present position as the Manager of Maintenance Operations at the Eagan Bulk Mail Center. Id.

After work on January 9, 2004, Chase claimed that he went to the emergency room, was diagnosed with hypertension, and that he received medication to treat this condition. Id. at pp. 17-18. On Monday January 12, 2004, Chase contacted his employer's Attendance Control Office to report his absence. Id. at pp. 19-20. Chase also left a telephone message for his supervisor, Jim Flinn ("Flinn"), informing him that he was out on sick leave, requesting FMLA leave, and stating that he had seen a doctor and that he would forward doctor's slips to Flinn. Id. at pp. 19-21. Flinn claimed that he called Chase on January 12, 2004, and left him a message asking for documentation regarding his condition. See Affidavit of Elizabeth A. Glidden ("Glidden Aff."), Ex. M (Flinn Dep.) at pp. 28-30. Chase faxed to Flinn his prescription for Atenenol, a medication used to treat hypertension, signed by his doctor. See Defs.' Ex. 1 (Chase Dep.) at p. 22-23. There was no narrative from Chase's doctor contained on the prescription. Id. at p. 23. However, the prescription did state that the Atenenol was for blood pressure. Id., Deposition Exhibit 6 (January 10, 2004 Prescription).

On January 12, 2004, Mike Forde, the FMLA Coordinator for the Northland District, sent Chase a FMLA Certification Letter dated January 12, 2004, which provided in relevant part:

> You have recently requested FMLA protected leave for your

2

> condition. However, I do not have any FMLA medical certification to substantiate if you have a serious health condition under the Family Medical Leave Act of 1993 [FMLA].
> Therefore, I am requesting FMLA medical certification for your asserted serious condition.
>
> I have enclosed a Publication 71, *Notice for Employees Requesting Leave for Conditions Covered by the Family and Medical Leave Act*, as a WH-380, *Certification of Health Care Provider*. If you believe your condition is a serious health condition, please have the WH-380 completed and returned to me within [15] days.
>
> * * *
>
> **If you fail to produce the certification within 15 days off your receipt of this letter, the leave is not protected by the FLMA and may result in disciplinary action.**
>
> * * *
>
> Also I am the custodian of FMLA medical certification. Therefore, please submit the original medical certification to me.

See Glidden Aff., Ex. A (emphasis in original). Flinn was copied on this letter. Id. Nevertheless, despite receiving a copy of the letter from Forde to Chase, Flinn still expected that Chase to provide him with documentation regarding his illness. In this regard, Flinn testified:

> Q: Okay. So at that point in time after you received that letter from Mr. Forde, did you expect that something – that you were going to receive something different or additional from Mr. Chase?
>
> **A: Yes.**
>
> Q. Okay. And what did you expect you were going to receive?
>
> **A: I was expecting to receive documentation from his doctor clearing him to come back to work or telling me why he was out for three days.**
>
> Q: Okay. Even though you knew that Mr. Forde was the person

> who is responsible to receive that Family Medical Leave Act certification?
>
> **A: At that point, it had nothing to do with family medical leave. When I first asked for the documentation, it was strictly it's management prerogative to ask for documentation at any point someone calls in.**
>
> * * *
>
> Q: Okay. And why, after you received that form letter from Mr. Forde, did you expect that Mr. Chase was going to give documentation regarding his absence to you?
>
> **A: Previous experience with FMLA and with people on sick leave, I have the right to ask for that. And it has been provided in the past.**

See Glidden Aff., Ex. M (Flinn Dep.) at pp. 30-32.

Chase returned to work on January 20, 2004. See Defs.' Ex. 1 (Chase Dep.) at p. 35. Chase's medical provider submitted a completed Form WH-380 covering Chase's absence from January 12, 2004 to January 19, 2004. Id. at p. 28, Deposition Exhibit 4. The time missed by Chase during this period was originally paid as sick leave, but was subsequently changed to FMLA sick leave on March 26, 2004. See Defs.' Ex. 3, Declaration of Jean Woodford ("Woodford Decl."), ¶ 2(a).

During the workday on January 20, 2004, Chase went into Flinn's office and complained that he was not feeling well, and that he was going to call the Medical Unit to see what they recommended. See Defs.' Ex. 1. (Chase Dep.) at pp.35-36. Flinn told Chase that he should go see his doctor or the Medical Unit. See Glidden Aff., Ex. M (Flinn Dep.) at p. 45. Chase called the Medical Unit and Nurse Nancy Gehrman ("Nurse Gehrman") recommended that he should go see his own doctor.[2] See Defs.' Ex. 1 (Chase Dep.) at pp. 36-37. Prior to

---

[2] Chase did not see his medical provider until February 10, 2004. See Defs.' Ex. 1

4

leaving for work, Chase received a fax from Nurse Gehrman that contained the following hand written comments:

> The following is needed to RTW [return to work] if not a serious condition less than 3 days and not more than 21 – or if required by supervisor.

The form portion of the fax from Gehrman included the following:

> In order for the documentation to be deemed "acceptable", the employee needs to provide the following additional information to the Medical Unit regarding the absence:
>
> \_\_\_\_ Names of employee on documentation.
>
> \_\_\_\_ Explanation of the nature of the employee's illness or injury (ELM 513.364)
>
> \_\_\_\_ Explanation that employee was (or will be) unable to perform his or her normal duties for the period of absence (ELM 513.364)
>
> \_\_\_\_ Indication that employee is able to return to full duty without limitations or if light duty is requested, specific limitations must be stated.
>
> \_\_\_\_ Original document of physician or practitioner, however it must meet the requirements set forth in DLM 513.364. (A faxed copy of signature will be accepted if sent directly from doctor/practitioner's office).
>
> \_\_\_\_ Printed name, phone number and address of physician or other practitioner.

Id. at p. 37, Deposition Exhibit 7. After receiving the fax from Nurse Gehrman, Chase left work and did not return to work until February 23, 2004. Id. at pp. 37, 40.

Chase claimed that he maintained contact with Flinn regarding his condition by leaving Flinn messages and by forwarding copies of his prescriptions to Flinn. Id. at pp. 38-40. However, on January 29, 2004, Flinn changed Chase's pay status from "sick leave" to "AWOL"

---

(Chase Dep.) at pp. 37-38.

5

status because Chase had not provided to him the medical documentation substantiating Chase's leave. Glidden Aff., Ex. B (Flinn Timeline of Events – January 23, 2004 Entry); Glidden Aff., Ex. M (Flinn Dep.) at pp. 39, 46-48; Ex. F (TACS Adjustment Certification).

On February 7, 2004, Forde, the FMLA Coordinator, sent Chase another FMLA Certification Letter, which provided in relevant part:

> I am in receipt of your FMLA certification undated but received in this Office on 1/20/04. The FMLA certification provided that you were incapacitated from 1/11/04 through 1/19/04. It has come to my attention that you did not return to work after this period and have not returned to date. On 2/11/04 I received a note that said you would return to work 2/16/04. However, I do not have any **current** FMLA medical certification to substantiate you have a continuing serious health condition under the Family and Medical Leave Act of 1993 [FMLA] for the period 1/20/04 through 2/16/04.
>
> Therefore, I am requesting **updated** FMLA medical certification for you asserted serious condition for the period 1/20/04 through your return of work date of 2/16/04.
>
> I have enclosed a Publication 71, *Notice for Employees Requesting Leave for Conditions Covered by the Family and Medical Leave Act*, as a WH-380, *Certification of Health Care Provider*. If you believe your condition is a serious health condition, please have the WH-380 completed and returned to me within [15] days.
>
> * * *
>
> **If you fail to produce the certification within 15 days off your receipt of this letter, the leave is not protected by the FLMA and may result in disciplinary action.**
>
> * * *
>
> Also I am the custodian of FMLA medical certification. Therefore, please submit the original medical certification to me.

See Defs.' Ex. 1 (Chase Dep.), Deposition Exhibit No. 10. Flinn was copied on this letter.

6

See Glidden Aff., Ex. M (Flinn Dep.) at p. 39.

On February 23, 2004, the Postal Service received the second FLMA certification dated February 19, 2004. . See Defs.' Ex. 1 (Chase Dep.), Deposition Exhibit No. 11. The certification was filled out by Chase and signed by his doctor, and stated that he was incapacitated from January 19, 2004 to February 16, 2004. Id. at pp, 47-48.

On February 23, 2004, Chase returned to work. Id. at p. 50. Although he had medical restrictions placed on him by his doctor, he only provided those restrictions to the Medical Unit and not to Flinn. Id. However, on the same day, Nurse Gehrman emailed Flinn regarding Chase's absence and his work restrictions:

> Steven Chase has provided medical information concerning his absence from work since early January. This information has been reviewed by the POMD and he may return to work today . . . with restrictions.
>
> His restrictions are to return to a moderate workload. We have asked Mr. Chase to have his PMD provide a specific definition of what "moderate workload" is. We have not received that as yet but he POMD feels the following restrictions describe a moderate workload for a manager. No more than 8 hours of work per day, 5 work days per week, followed by 2 rest days.

See Glidden Aff., Ex. H.

Although Flinn had received Nurse Gehrman's email, he did not change Chase's status from AWOL to sick leave because he was waiting for the documentation that he had requested from Chase. Glidden Aff., Ex. M (Flinn Dep.) at pp. 47-48).

When Chase returned to work on February 23, 2004, he did not report to Flinn. Instead, Flinn found Chase and told Chase that he wanted to have an investigative interview with him the next day to address his not reporting to Flinn and regarding the documentation Chase needed to provide to Flinn. Id., Ex. B (Flinn Timeline of Events); see also Defs.' Ex. 1 (Chase

7

Dep.) at p. 50.  On February 24, 2004, Chase was absent from work and did not return to work until March 8, 2004.  See Glidden Aff., Ex. B (Flinn Timeline of Events); see also Defs.' Ex. 1 (Chase Dep.) at p. 54.  On the night of February 26, 2004, Chase left Flinn a telephone message saying that he had just left the doctor's office, that he could not go back to work until after he had a physical on March 5, 2004, and that he was on FMLA leave until then.  See Glidden Aff., Ex. B (Flinn Timeline of Events).

According to the Manager for TACS Operations, Chase's time from January 21, 2004 through January 23, 3004 and January 26, 2004 through February 20, 2004 was recorded as AWOL.  See Defs.' Ex. 3, Woodford Decl., ¶ 2 (b), (c), (e).  After February 20, 2004 and until March 8, 2004, Chase's absences were recorded as sick leave or FMLA sick leave.  Id., ¶ 2(e).[3]

On March 4, 2004 Flinn sent Chase a letter informing him that he owed the Postal Service $709.42 based on his failure to submit the proper paper work to change one of his missed weeks from AWOL to Sick Leave.  See Glidden Aff., Ex. K.  The $709.42 represented the cost of benefits Chase had received while his leave was recorded as AWOL.  See Defs.' Ex. 3, Woodford Decl., ¶ 2(g).

On March 8, 2004, the Medical Health Unit sent an email to Flinn listing Chase's medical restrictions.  See Glidden Aff., Ex. L.  On the same day, Flinn stated that he attempted to change Chase's status from AWOL to FMLA sick leave when he called the

---

[3] However, Flinn testified at his deposition that he began to charge Chase with sick time as opposed to AWOL as of February 9, 2005, but that this did not change the requirement that Chase bring him the appropriate documentation.  See Glidden Aff., Ex. M (Flinn Dep.), pp. 47-48.  This is supported by the Absence Analysis filled out by Flinn for Chase, which shows that as of February 9, 2004 Chase was being charged with sick leave as opposed to AWOL. Id., Ex. J.  On the other hand, Flinn testified that Chase pay was not processed for the period of January 21, 2004 through March 5, 2004.  Id., Ex. M (Flinn Dep.) at p. 25.

8

Medical Unit and learned that Chase had documentation on file. Id., Ex. M (Flinn Dep.) at p. 44. On March 26, 2004, Chase's AWOL status was removed and he was paid FMLA sick leave for the hours previously recorded as AWOL. See Defs.' Ex. 3, Woodford Decl., ¶ 2(c). The debt of $709.42 was cancelled on April 9, 2004. Id., ¶ 2(g). Chase acknowledged that he received "his back pay and his alleged debt of $709.42 for being AWOL was erased." See First Amended Complaint, ¶ 34.

Leave policies for the Postal Service are governed by its Employee and Labor Relations Manual ("ELM"). Def. Ex. 5, Declaration of Thomas Gergen ("Gergen Decl."), ¶ 1. According to this Manual, an employee must document to their supervisor the need for paid sick leave for absences longer than three days. Id., ¶ 2 (citing ELM § 513.364). This documentation should provide an explanation of the nature of the employee's illness and indicate to management that the employee is unable to perform normal duties for the period of absence. Id., ¶ 3 (citing ELM § 513.364). In addition, the Manual provides that failure to provide proper documentation can result in an employee being charged with AWOL. Id., ¶ 5 (citing ELM § 513.365). An employee who has FMLA approved leave does have the option of using paid sick leave, however, the employee is required to follow the ELM requirements for being approved for sick leave, and failure to do so will result in unpaid FMLA protected leave. Id., ¶¶ 6-8.

## II. STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celeotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also

9

Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999). "[S]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327. "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" DePugh v. Smith, 880 F. Supp. 651, 656 (N.D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed. Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995). "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial." Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, *4-5 (D. Minn. 2003) (citations omitted). The non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy." Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995).

Summary judgment is appropriate where the material facts are not in dispute, and the court need only apply the law to the facts in the record. See Eisenrich v. Minneapolis Retail Meat Cutters, 282 F. Supp. 1077, 1080-81 (D. Minn. 2003) (citing Oldham v. West, 47 F. 3d 985, 988 (8th Cir. 1995)).

## III. DISCUSSION

### A. Interference Claim under 29 U.S.C. § 2615(a)(1)

The FMLA entitles eligible employees "to take leave from work for certain family or medical reasons, including a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" Cooper v. Olin Corp., Winchester Div., 246 F.3d 1083, 1090 (8th Cir.2001) (quoting 29 U.S.C. § 2612(a)(1)). Under 29 U.S.C. § 2615 it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided. . . ." 29 U.S.C. § 2615(a)(1); Rutscchke v. Northwest Airlines, Inc., No. Civ. 04-3212 (RHK/AJB), 2005 WL 2100985 at *6 (D. Minn. Aug. 30, 2005) ("'Among other prohibitions, FMLA prohibits an employer from interfering with an employee's exercise of [his] FMLA rights.'") (quoting Cooper, 246 F.3d at 1090) (citations omitted)). The regulations interpreting § 2615(a)(1) provide that "'[i]nterfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. It would also include manipulation by a covered employer to avoid responsibilities under FMLA. . . ." See 29 C.F.R. § 825.220(b). Any violation of the FMLA or its regulations constitutes interference. See 29 C.F.R. § 825.220(b); see also Regan v. Natural Resources Group, Inc., 345 F. Supp.2d 1000, 1010 (D. Minn. 2004).

In order to prevail on a § 2615(a)(1) claim, an employee must show "'by a preponderance of the evidence that he was entitled to the benefit denied.'" Carlsen v. Green Thumb, Inc., Civ. No. 01-2076 (JRT/RLE), 2004 WL 234406 at *4 (D. Minn. Feb. 4, 2004) (quoting Strickland v. Water Works & Sewer Bd., 239 F.3d 1199, 1206-07 (11th Cir.2001)).

Under the FMLA, an employer is liable for "any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation." 29 U.S.C. § 2617(a)(1)(A)(i)(I).

Chase has conceded that he was approved for FMLA leave from January 12 through March 8, 2004. See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem.") at p. 8. Nevertheless, Chase asserts that the Postal Service interfered with his FMLA rights because he was not paid sick leave while he was out on protected FMLA leave. See First Amended Complaint, ¶ 29. Defendants argued that Chase's claims cannot be considered as interference because he received his FMLA leave, and that the reason this leave was not initially designated as sick leave (for which he could receive his pay) was that he failed follow the Postal Service's paid leave policy in order to receive such pay. See Defendant's Memorandum of Law in Support of Summary Judgment ("Defs.' Mem.") at p. 7. Specifically, defendants claimed that Chase never submitted acceptable medical documentation to his supervisor, Flinn, as required by the Postal Service's requirements. Id. In response, Chase argued that he submitted the necessary medical information to the FMLA Coordinator and that nothing in the Postal Service's policies requires an employee to submit documentation directly to his supervisor. See Pl.'s Mem. at pp. 8-9.

The FMLA "allows 'eligible' employees of a covered employer to take job-protected, unpaid leave, <u>or to substitute appropriate paid leave</u> if the employee has earned or accrued it, for up to a total of 12 workweeks in any 12 months . . . because the employee's own serious health condition makes the employee unable to perform the functions of his or her job." 29 C.F.R. § 825.100(a) (emphasis added). However, 29 U.S.C. § 2612(d)(2)(B) provides in

12

relevant part that "nothing in this title shall require an employer to provide paid sick leave . . . in any situation in which such employer would not normally provide any such paid leave." Id. The Department of Labor has interpreted this portion of the statute as follows:

> Substitution of paid sick/medical leave may be elected to the extent the circumstances meet the employer's usual requirements for the use of sick/medical leave. An employer is not required to allow substitution of paid sick or medical leave "in any situation" where the employer's uniform policy would not normally allow such paid leave.

29 C.F.R. § 825.207(c); see also Geromanos v. Columbia University, 322 F.Supp.2d 420, 432 (S.D.N.Y. 2004) ("Since Congress did not require FMLA leave to be paid leave, Columbia was free to impose whatever conditions it chose as a condition of continuing plaintiff's salary while she was not working. . . .").

The issue in this case is not whether Chase provided proper notification to receive FMLA leave, as not only did he provide the proper notification, but he concedes that he was approved for FMLA leave. Instead, the issue is whether the Postal Service's refusal to designate Chase's FMLA leave as sick leave constituted interference under the FMLA. See generally, Chubb v. City of Omaha, 424 F.3d 831, 832 (8th Cir. 2005) (distinguishing between FMLA leave and paid sick leave). If this Court concludes as a matter of law that Chase did not follow the Postal Service's normal requirements for the use of sick leave in substitution of unpaid leave under the FMLA, then any claim of interference with his FMLA rights will fail.

In support of his assertion that he did what he needed to do to obtain sick leave, Chase argued that the sick leave documentation requirements do not require that such documentation be provided to supervisor in order to obtain sick leave. See Pl.'s Mem. at p. 9. This Court disagrees. First, Chase himself admitted that an employee's manager is the one who approves or disapproves the type of leave an employee requests, and that such approval is

13

independent from any FMLA determination.  See Def. Ex. 1 (Chase Dep.) at pp. 9-10.

Second, an employee who has FMLA approved leave may elect to take paid leave, annual leave or sick leave.  Stark presented no evidence to contradict the defendants' argument that an employee must follow the sick leave procedure set forth in ELM § 513.36.  See Def. Ex. 5 (Gergen Decl. ¶¶ 6, 7).  According to ELM, if the employee fails to provide the sick leave documents to the supervisor or manager as required by ELM § 513.36, the employee's FMLA leave will be unpaid.  Id. at ¶ 8.

Third, contrary to Chase's assertion, the Postal Service manual, ELM, clearly requires that an employee submit documentation to a supervisor in order to be approved for the use of sick leave.  See Defs.' Ex. 5, ELM § 513.331.  In particular, this manual states that a "supervisor is responsible for approving or disapproving requests for sick leave . . . ." Id. at ELM § 513.342.  Further, while a supervisor may accept an employee's statement explaining an absence less than three days, "for absences in excess of 3 days, employees are required to submit medical documentation or other acceptable evidence of incapacity for work. . . ." Id., ELM § 513.361, ELM § 513.362.  The medical documentation to a supervisor should provide:

> [A]n explanation of the nature of the employee's illness or injury sufficient to indicate to management that the employee was (or will be) unable to perform his or her normal duties for the period of absence. Normally, medical statements such as 'under my care' or 'received treatment' are not acceptable evidence of incapacitation to perform duties. Supervisors may accept substantiation other than medical documentation if they believe it supports approval of the sick leave request.

Id.  If an employee fails to substantiate their incapacitation, absence may be charged to annual leave, LWOP [leave without pay], or AWOL.  Id., ELM § 513.365; Gergen Decl. ¶ 5

Chase also argued that ELM's requirements for sick leave must be interpreted in conjunction with Postal Service's policy regarding medical record privacy, as well as the

instructions he received from Forde, the FLMA Coordinator, and Nurse Gehrman at the St. Paul Medical Unit.  See Pl.'s Mem. at p. 10.  Chase cites to excerpts in the Postal Service's Management Instruction EL-860-98-2 for the proposition that medical records cannot be forwarded to a supervisor.  Id. at p. 6 citing to Glidden Aff., Ex. I at pp. 1-3, 15.  However, EL-860-98-2 specifically contemplates that supervisors not only can, but must receive medical documents in conjunction with requests for sick leave:

> **Supervisor Handling of Medical Information**
> <u>Medical documentation is necessary to certify the need for medically related</u> absence, <u>sick leave</u>, light duty, or other administrative activities or decisions. Medical documents received by a supervisor from an employee that contain a diagnosis are considered to be restricted medical records and must be forwarded to the local medical records custodian for placement into the employee medical folder. Supervisors, upon receipt of restricted medical documentation, are subject to Privacy Act requirements concerning the proper handling of restricted medical information.

See Defs.' Ex. 7, EL-860-98-2 at pp. 9-10 (emphasis added).  In addition, this Court notes that medical information may be maintained by non-medical personnel relating to medical information necessary for management decision-making, including sick leave requests.  Id. at p. 12.  As such, this Court rejects Chase's claim that a supervisor cannot receive medical documentation from an employee in conjunction with a request for sick leave.

Further, Chase has not provided this Court with any evidence that Forde, the FMLA Coordinator, instructed Chase to submit all medical documents dealing with his request for sick leave to him directly.  The only communications from Forde to Chase were the FMLA certification letters sent to Chase on January 14, 2004 and February 7, 2004, which instructed Chase to send the original FMLA medical certifications to the FMLA Coordinator.  See Glidden Aff., Ex. A; Defs.' Ex. 1 (Chase Dep.), Deposition Exhibit No. 10.  Similarly, there is

15

nothing in the record that indicates that Nurse Gehrman instructed Chase to submit all medical documentation only to the St. Paul Medical Unit, or that she played any role in the approval of sick leave.  See Def. Ex. 6 (Declaration of Nancy Gehrman).  The only communication between Nurse Gehrman and Chase regarding the submission of medical documents was the January 20, 2004 fax that instructed Chase to submit all medical documents to her in order to be allowed to return to work.  See Defs.' Ex. 1 (Chase Dep.) at p. 37, Deposition Exhibit 7.  In other words, neither Forde's nor Gehrman's communications to Chase make any mention of the proof requirement for a request for sick leave.

The undisputed facts in this case show that the only medical documentation that Chase submitted to his supervisor, Flinn, was the medical prescriptions from Chase's doctor.  Id. at pp. 22-23, 41-42, Deposition Exhibit No. 6.  However, these prescription notes do not meet the requirement of ELM § 513.364 as they do not provide any explanation regarding the nature of the Chase's condition sufficient to indicate to Flinn that Chase was or would be unable to perform his normal duties for the period of absence.

In summary, the undisputed facts establish that Chase was given his FMLA leave as requested, and that to the extent that this leave was first designated as AWOL due to his failure to comply with Postal Service requirements that the appropriate medical documentation be submitted to the person who could approve sick leave, Chase's supervisor.  Under these facts, the Postal Service's refusal to pay Chase sick leave for his FMLA leave does not constitute interference with Chase's rights under the FMLA.  As such, this Court recommends that defendants' motion for summary judgment as it pertains to Chase's FMLA interference claim be granted.

B.    Retaliation Claim under 29 U.S.C. § 2615(a)(2)

Chase asserts that defendants retaliated against him for asserting his rights under the FMLA when he was notified that he was AWOL and that he was required to pay back $709.42. See First Amended Complaint, ¶¶ 30-31. As stated previously, the $709.42 represented the cost of benefits he received while his leave was recorded as AWOL. See Defs.' Ex. 3, Woodford Decl., ¶ 2(g). The FMLA prohibits employers from discriminating against employees for asserting rights under the Act. See 29 U.S.C. § 2615(a)(2). An employee can prove FMLA retaliation using a variant of the burden shifting test established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).[4] See Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002). "To establish a prima facie case of FMLA retaliation, an employee must show that [he] engaged in activity protected under the Act, that [he] suffered an adverse employment action by the employer, and that a causal connection existed between the employee's action and the adverse employment action." Darby v. Bratch, 287 F.3d 673, 679 (8th Cir. 2002) (citation omitted); see also McBurney v. Stew Hansen's Dodge City, Inc., 398 F.3d 998, 1002 (8th Cir. 2005).

Defendants argued on summary judgment that Chase's retaliation claim should fail because being temporarily placed on AWOL was not an adverse employment action. See Defs.' Mem. at pp. 9-10. An adverse employment action constitutes a change in working conditions that produces a material employment disadvantage. See Duncan v. Delta Consol.

---

[4]   "'Congress clearly contemplated that the proper framework for analyzing a retaliation claim based on circumstantial evidence under § 2615(a)(2) of the FMLA is the shifting burdens of proof analysis first established in [McDonnell Douglas]' and noted that the retaliation provisions of the FMLA were 'derived from Title VII . . . and [were] intended to be construed in the same manner. . . .'" Gonzalez v. City of Minneapolis, 267 F. Supp.2d 1004, 1010 (D. Minn. 2003) (quoting Kaylor v. Fannin Reg'l Hosp., Inc., 946 F. Supp. 988, 999 (N.D. Ga. 1996)).

Indus., 371 F.3d 1020, 1026 (8th Cir. 2004) (Title VII case) (citing Cossette v. Minn. Power & Light, 188 F.3d 964, 972 (8th Cir. 1999)). "Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard." Id. (citing Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1016 (8th Cir. 1999)).

Here, Chase has claimed that placement on AWOL resulted in a delay in receiving his sick pay and being asked to pay the Postal Service back money he was given in benefits while he was deemed to be AWOL. In turn, defendants have admitted that they placed Chase on AWOL, which caused a delay in Chase being paid for his sick leave, and that they did ask him to pay back $709.42. See Defs.' Ex. 3, Woodford Decl., ¶ 2(e), (g); Glidden Aff., Ex. M (Flinn Dep.), p. 25. In addition, there is no dispute that Chase's AWOL status was removed, he was paid sick leave for the hours previously recorded as AWOL in March 2004, and the debt of $709.42 was cancelled on April 9, 2004. See Defs.' Ex. 3, Woodford Decl., ¶ 2(c), (g); see also First Amended Complaint, ¶ 34.

However, this Court does not need to reach the issue of whether the defendants' actions against Chase constituted an adverse employment action. As stated above, Chase was not denied his FMLA leave. Instead, he was temporarily not paid sick leave because he failed to comply with the Postal Service's requirements for obtaining sick leave. See Report and Recommendation, Section III.A, supra. "In order to establish the prima facie case for FMLA retaliation, the employee must demonstrate that FMLA leave was the determinative factor in the employment decision at issue." Hatchett v. Philander Smith College, 251 F.3d 670, 677 (8th Cir. 2001) (citation omitted). Here, the determinative factor for placing Chase on AWOL and requiring him to pay back benefits he was given during this time period, did not arise out his receiving FMLA leave, but his failure to abide by the Postal Service's sick leave

18

policy. That is, Stark cannot show that his FMLA leave was a determinative factor in the Postal Service's designation of his leave as AWOL or its determination that Chase had to pay benefits back to the Postal Service. As such, this Court finds that Chase's retaliation claim fails as a matter of law, and that defendants' motion for summary judgment as to Chase's FMLA retaliation claim should be granted.

## **RECOMMENDATION**

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that:

1. Defendants' Motion for Summary Judgment [Docket No. 20] be **GRANTED**; and

2. Plaintiff's Complaint be **DISMISSED WITH PREJUDICE**.


Dated:      December 5, 2005

                                s/ *Janie S. Mayeron*
                                JANIE S. MAYERON
                                United States Magistrate Judge


Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **December 22, 2005** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.